# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3568-23

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

M.R.,

     Defendant,

and

A.P.,

     Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF
A.P.R., JR., a minor.

_____

     Argued May 6, 2025 – Decided June 16, 2025

     Before Judges Chase and Vanek.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Monmouth County, Docket No. FG-13-0032-24.

David A. Gies, Designated Counsel, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; David A. Gies, on the briefs).

Michelle J. McBrian, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Janet Greenberg Cohen, Assistant Attorney General, of counsel; Michelle J. McBrian, on the brief).

Todd S. Wilson, Designated Counsel, argued the cause for minor A.P.R., Jr. (Jennifer N. Sellitti, Public Defender, Law Guardian, attorney; Meredith A. Pollock, Deputy Public Defender, of counsel; Todd S. Wilson, on the brief).

PER CURIAM

A.P.[1] (Aaron) appeals from a judgment terminating his parental rights to his son, A.P., Jr. (Austin). Austin's mother, M.R. (Mia), surrendered her parental rights.[2] We affirm.

---

[1] We use initials and pseudonyms to protect privacy interests and the confidentiality of the trial record. R. 1:38-3(d)(12).

[2] Mia did not participate in this appeal.

I.

We summarize the salient facts from the record developed at the four-day fact-finding hearing. The Division of Child Protection and Permanency (the Division) proffered the testimony of caseworkers Michael Deianni, Jillian Lepore and Angela Lockwood; S.M. (Skye), Mia's maternal sister and Austin's resource parent; and Dr. Karen D. Wells, a licensed psychologist. The Law Guardian did not proffer any witnesses and supported the Division's plan for Skye to adopt Austin. Aaron objected to the termination of his parental rights and testified on his own behalf, but did not present any additional witnesses or move any documents into evidence.

Aaron met Mia while she was living across the street with her father, who provided housing and support to her. Mia had been struggling with schizophrenia and depression for over twenty years and attended an "adult daycare facility," receiving social security income and supplemental nutrition assistance program (SNAP) benefits. After her father died, Mia received housing through social services placements and Aaron moved in with her. Aaron held on to Mia's benefits cards and made various purchases on her behalf.

Austin was born premature on August 20, 2022, weighing only three pounds. Mia identified Aaron as Austin's father. Medical staff referred Mia and

Austin to the Division on the day he was born due to Mia's cocaine-positive drug screen, her previous diagnosis of depression and schizophrenia, and Austin's premature birth.

When the Division caseworkers visited Mia in the hospital, she denied using cocaine, claiming she may have absorbed it while standing next to someone using it. She stated she did not have permanent housing and had been largely transient, living with Aaron in motels for the past few years after her father passed away.

Austin tested positive for cocaine and remained hospitalized for several weeks. Upon discharge, the Division instituted a safety protection plan (SPP) through which Austin moved into the home of his maternal aunt, Skye, requiring her to supervise Mia with the newborn.

Skye refused to allow Aaron to live with them because she believed he was abusive to Mia. Mia confirmed that Aaron would sometimes yell at her and hit her. Skye expressed concern that Aaron was using Mia for free housing, her social security income, and her SNAP benefits.

Within a few weeks, Mia and Skye reported things were not going well at home. Skye stated Mia was acting "bizarrely" and accusing her of mistreating Austin. Mia stated she wanted to move into a hotel with Aaron, but was told by

Division caseworkers she could not remove Austin from Skye's home. By the end of September, Mia moved in with Aaron and left Austin with Skye.

The Division arranged for Mia and Aaron to visit Austin and met with them to explain the visitation process and encourage them to participate in services. Skye testified she and her husband, M.M. (Mason), were open to contact with both parents at first and allowed them to visit Austin in their home. However, Aaron never took care of Austin when he visited and did not call to check on him. Over the next year, Mia and Aaron saw Austin only sporadically through Division-assisted visitation.

Caseworker Lepore testified the Division arranged supervised visitation in December 2022 with the Greater Monmouth County child visitation program, but the parents were terminated from that program due to consistently missing visits. As an alternative, the Division arranged visits at Skye's home and the Division's office.

The parents began visiting more consistently in late 2023, but they often argued at visits with Aaron threatening to call the police and have Mia hospitalized. Both parents were aware Mia was not supposed to attend Aaron's visits with Austin in the community, but she came anyway, even when Lepore explained the Division's concerns about her mental instability, safety issues,

lack of a defined plan for Austin, and Aaron's inability to separate himself from Mia. Lepore often saw Aaron and Mia together in the community, and she did not feel that Aaron intended to separate from Mia because he felt he needed to take care of her. When the two were together, Aaron usually argued with Mia, called her crazy, signaled with hand motions that she was crazy, and told her he was going to have her committed. Lepore testified when she met with Aaron individually, Mia would call him nonstop, and he would continue to answer her phone calls and yell at her in Spanish.

On September 9, 2022, Aaron attended a substance abuse evaluation which revealed he did not need any services since his urine screens were negative at the time. Lepore testified Aaron then delayed submitting a drug screen until March 2023, when he tested positive for cocaine. Aaron also tested positive for cocaine in April, June, August, and September 2023. During a September 2023 evaluation, Aaron admitted to using "cocaine pills" on and off for two years. Aaron claimed the unidentified pills were doctor-prescribed, but he could not provide proof of the prescription, the name of the prescribing doctor, or the name of the medication.

In October 2023, Aaron began an intensive outpatient substance abuse program (IOP) at New Hope's Phillips House in Long Branch, which he attended

6

inconsistently for the first few months. After the Division filed its guardianship complaint in November 2023, Aaron began to attend the IOP more regularly. He also attended parenting classes in 2024.

Division adoption worker Angela Lockwood testified that Austin was doing well with the resource family and had just started speech therapy. Lockwood testified the Division had concerns about parental visitation because, despite Aaron often acting aggressive and hostile toward Mia, making the visitation workers feel uncomfortable and unsafe, Aaron was still unable to separate himself from Mia. This resulted in the visitation workers terminating Aaron's transportation to and from visits with Austin. Lockwood testified that the Division sought termination of Aaron's parental rights so that Austin can be adopted since Aaron cannot provide the stability the child requires.

Skye testified about Austin's placement with her and her husband, Mason, her interactions with Mia and Aaron, and their commitment to adopting Austin. Austin was scheduled to start speech and developmental intervention services because his speech began regressing after his parents began visiting more regularly.

When asked about Kinship Legal Guardianship (KLG) as opposed to adoption, Skye testified she understood the differences between the two and

expressed a desire for her and Mason to adopt Austin. Skye testified she would not agree to KLG because Aaron did not respect her, nitpicked her, made false allegations that she beat Austin and did not feed him, and threatened to report her to the police. She heard Aaron talk negatively about her and call her "the B word," when Mia mistakenly failed to hang up the phone. Because KLG would involve coordination with Aaron, she would be willing to have Austin removed rather than agree to KLG.

Dr. Wells, who was qualified as an expert in clinical and forensic psychology, completed a psychological evaluation of Aaron, a bonding evaluation of Aaron and Mia with Austin, and a comparative bonding evaluation of both relative resource parents with Austin. In reviewing the records provided, Dr. Wells found it significant that: (1) Austin was a premature, substance exposed baby, born to a mother with developmental delays; (2) the parents had transient housing; (3) Mia lacked any prior parenting experience and her family had been providing her support; and (4) the parents had failed to consistently visit the child, negatively impacting the development of a bond with Austin.

Dr. Wells found Aaron's visitation with Austin deficient and inconsistent. Neither parent took advantage of Skye's offer for more liberal visitation in her home, and Aaron repeatedly objected to Skye transporting Austin to visits

despite it presenting an opportunity to mend the relationship and potentially provide more access to Austin. Dr. Wells had additional concerns about Mia and Aaron arguing during visits and Aaron's poor judgment in feeding Austin. Mia called Aaron more than fifty times during Aaron's four-hour assessment, with Aaron answering all of her calls despite Dr. Wells asking him not to.

Dr. Wells completed three psychological tests of Aaron which showed he had a limited understanding of a child's developmental needs and believed children are "really little adults and that most children are alike." Aaron "ha[d] unrealistic expectations about what a child is capable of doing . . . ." Dr. Wells opined, despite attending services, Aaron had not acquired the knowledge needed to provide Austin with day-to-day care and advocate for the services Austin needed due to his premature birth and possible autism diagnosis. Dr. Wells found a transfer of Austin to Aaron's care "was not a viable plan now or within the foreseeable future" based on concerns about Aaron's comprehension and inability to adhere to instruction related to Austin's developmental needs, Aaron's continued enmeshment with Mia, minimization of his own inadequacies, and his lack of understanding as to childcare demands.

During Aaron and Mia's bonding evaluation, Dr. Wells found Austin had a fluid and insecure bond with Aaron, meaning he recognized him as a familiar

9

figure he may interact with, but did not trust him as a caregiver or view him as reliable. She testified the termination of Aaron's parental rights would not do more harm than good because Austin had no emotional connection to Aaron and would not even realize he lost a relationship. Dr. Wells opined, if Aaron had been more consistent with visitation, Austin may have developed a closer bond with him. However, Dr. Wells testified that, even with more time for visits, Austin would never view Aaron as a psychological parent, even with increased contact.

In contrast, Dr. Wells found Austin had an intact and secure bond with Skye and Mason, who he looked to as his psychological parents and trusted to attend to his needs reliably. Dr. Wells concluded Austin should achieve permanency through adoption with Skye and Mason, who have consistently cared for him since birth. Dr. Wells testified that if Austin was removed from Skye and Mason, he would be exposed to bewilderment, regression, and harm to his ability to trust adults.

Aaron testified he was currently working on a farm and living with a married couple and their children, without Mia. Aaron proposed the woman who owned the home would watch Austin while he worked, or he would get a babysitter. There were no further details or corroborating testimony presented.

10

Aaron acknowledged Austin was doing well with Skye and Mason and testified he did not mind if Austin stayed with the resource parents as long as he could visit him. Aaron asserted he no longer lives with Mia, since her most recent mental health hospitalization. However, he did not testify that he is no longer involved with Mia and answered several of her phone calls while on the witness stand.

On June 26, the trial court issued an oral decision and found the Division established the four prongs necessary for the termination of Aaron's parental rights under N.J.S.A. 30:4C-15.1 by clear and convincing evidence. The court found all witnesses proffered by the Division to be credible and particularly relied on the testimony of Dr. Wells.

The court did not find Aaron's testimony to be credible stating, "he was giving answers that he thought would work for what he believes the [c]ourt needed to [hear]." The court found it had no "comfort level" that Aaron "knew how to parent" and concluded Aaron's parenting judgment was impaired, citing his offering Austin a lollipop "at a ridiculously young age" as an example.

As to the first prong, the court found Aaron's continued involvement with Mia placed Austin at heightened risk due to his inability to separate himself from her. The court was concerned about Aaron's continued relationship and

"interlocking" with Mia, finding Aaron responded to Mia's phone calls even while he was on the witness stand and answered over fifty of her calls during Dr. Wells' evaluation.

Further, the court found Aaron allowed Austin to form bonds with Skye and Mason for the first year of his life while failing to take the necessary action to create his own bond or have Austin placed in his care. It was not until the post-permanency hearing that Aaron demonstrated anything beyond "some interest" in Austin's well-being, and Aaron's failure to consistently visit for a year demonstrated his lack of "seriousness of purpose" to independently parent.

As to prong two, the court found Aaron was unwilling or unable to eliminate the harm to Austin, with the delay in placement only adding to the harm. The court found Aaron "ha[d] never demonstrated he even ha[d] a sense of appreciation for the harm facing [Austin]" due to his inaction. For the first year of Austin's life, Aaron was only involved through his reliance on Mia and remained too enmeshed with her even though they recently moved into separate dwellings.

The court further found Aaron had neither an appreciation of Austin's needs nor the harm that could result if he obtained custody. The court also found Aaron lacked an understanding of what it takes to raise a child and did not give

any sense he could independently parent Austin, beyond having a safe and stable dwelling.

As to prong three, the court found the Division amply demonstrated it made reasonable efforts since the inception of the case. The court determined the Division attempted to avoid taking custody by implementing an SPP and placing Austin with Skye. The court recognized that the Division explored KLG with Skye, but due to Aaron's behavior and accusations against her, Skye was not willing to enter KLG as she did not believe it would be in Austin's best interest.

Finally, as to prong four, the court found the Division met its burden to establish the termination of Aaron's parental rights would not do more harm than good. The trial court relied on clear and convincing evidence of: (1) the problematic dynamic between Aaron and Mia; (2) Mia's severe mental health issues; (3) the fraught relationship between Aaron and the maternal family; (4) the lack of a bond between Austin and Aaron; and (5) Dr. Wells' unrebutted expert testimony that the maternal caregivers were Austin's psychological parents and that, if the relationship was severed, Austin would "be subjected [to] physical, psychological and emotional harm and distress . . . [that] would impact him negatively."

A-3568-23

Citing Dr. Wells' report and testimony, the court found Aaron could not exercise good judgment, failed to appreciate Austin's needs, had a volatile relationship with Mia, and did not have "the ability to balance all of life's situations of work, home life, taking care of the child, [and] emergencies." After considering the evidence, the court entered a judgment of guardianship in favor of the Division and terminated Aaron's parental rights.[3]

This appeal follows.

## II.

Our scope of appellate review is limited. It is well established in Title 30 cases that appellate courts should not second-guess or substitute their judgment for the family court's, provided its factual findings are "grounded in substantial and credible evidence in the record." N.J. Div. of Child Prot. & Permanency v. D.C.A., 256 N.J. 4, 19 (2023). "Deference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" Cesare v. Cesare, 154 N.J. 394, 412 (1998) (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)).

---

[3] The trial court noted that Aaron fell asleep in the courtroom while its decision was being placed on the record.

A-3568-23

"We accord deference to fact[-]findings of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012). "[A] trial court's factual findings 'should not be disturbed unless they are so wholly unsupportable as to result in a denial of justice.'" N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 511 (2004) (quoting In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)); see also N.J. Div. of Child Prot. & Permanency v. D.A., 477 N.J. Super. 63, 80 (App. Div. 2023).

However, we owe no deference to a judge's legal conclusions which are reviewed de novo. N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 369 (2017); see also D.C.A., 256 N.J. at 19 (acknowledging we give no deference to the trial court's interpretation of N.J.S.A. 30:4C-15.1(a)).

III.

"Parents have a constitutionally protected right to maintain a relationship with their children." N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007). That right, however, "is not absolute" and is limited "by the State's parens patriae responsibility to protect children whose vulnerable lives or psychological well-being may have been harmed or may be seriously

A-3568-23

endangered by a neglectful or abusive parent." F.M., 211 N.J. at 447 (emphasis omitted).

In cases of guardianship and adoption, such as here, it is axiomatic that "[c]hildren have their own rights, including the right to a permanent, safe[,] and stable placement." N.J. Div. of Youth & Fam. Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004). We acknowledge "the need for permanency of placements by placing limits on the time for a birth parent to correct conditions in anticipation of reuniting with the child." Ibid. Thus, a parent's interest must, at times, yield to the State's obligation to protect children from harm. See N.J. Div. of Child. Prot. & Permanency v. R.L.M., 236 N.J. 123, 145 (2018).

To terminate a biological parent's right to a child, the trial court must consider whether the Division has proven the following four prongs of the best-interests test embodied in N.J.S.A. 30:4C-15.1(a):

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement

16

outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[N.J.S.A. 30:4C-15.1(a).]

The Division must prove each prong by "clear and convincing evidence." N.J. Div of Child Prot. & Permanency v. D.H., 469 N.J. Super. 107, 115 (App. Div. 2021). These prongs are not separate or distinct. R.L.M., 236 N.J. at 145. Rather, they overlap to require a general inquiry as to whether termination of parental rights serves a child's best interests. Ibid.

"The question ultimately is not whether a biological mother or father is a worthy parent, but whether a child's interest will best be served by completely terminating the child's relationship with that parent." N.J. Div. of Youth & Fam. Servs. v. T.S., 417 N.J. Super. 228, 249 (App. Div. 2010) (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 108 (2008)). "[P]arental fitness is the key to determining the best interests of the child." N.J. Div. of Youth & Fam. Servs. v. I.S., 202 N.J. 145, 170 (2010) (quoting In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999)).

A.

Aaron contends his "one-year delay in understanding the [e]ffect his cocaine use disorder and inconsistent visitation schedule may have had on his son did not demonstrate an inability or unwillingness to eliminate the perceived harm, given his subsequent appreciation of the risk posed by [Mia]'s mental health issues." Aaron further posits he has "demonstrated a willingness to eliminate the harm posed by [Mia]'s mental health issues by securing housing separate from [Mia], by successfully completing parenting classes[,] and by regularly passing drug screens for almost one year."

The Division, under prong one of N.J.S.A. 30:4C-15.1(a), must prove by clear and convincing evidence "the child's safety, health, or development has been or will continue to be endangered by the parental relationship." The proofs on this prong contemplate the Division establishing "harm that 'threatens the child's health and will likely have continuing deleterious effects on the child.'" N.J. Div. of Youth & Fam. Servs. v. A.L., 213 N.J. 1, 25 (2013) (quoting K.H.O., 161 N.J. at 352). "Although a particularly egregious single harm" can suffice, "the focus is on the effect of harms arising from the parent-child relationship over time on the child's health and development." K.H.O., 161 N.J. at 348.

Prong two also relates to parental fitness.  Id. at 352.  The inquiry "centers on whether the parent is able to remove the danger facing the child."  F.M., 211 N.J. at 451 (citing K.H.O., 161 N.J. at 352).  This prong "may be met by indications of parental dereliction and irresponsibility, such as the parent's continued or recurrent drug use, the inability to provide a stable and protective home, [and] the withholding of parental attention and care."  K.H.O., 161 N.J. at 353.  "The determinative issue is whether the circumstances surrounding the parental relationship . . . cause harm to the child."  M.M., 189 N.J. at 289.

Here, we are satisfied the record supports the trial court's finding that Aaron "harmed or is likely to continue to harm" Austin based on his inaction in fulfilling the child's need for a permanent home.  Aaron's lack of prioritization to attend services and visitation with Austin, lack of candor regarding his substance abuse, continued relationship with Mia, and poor visitation record supports the trial court's finding that Aaron is "likely to continue to harm" Austin, under prong one, and is unwilling or unable to eliminate the harm, under prong two.  As of March 2024, Aaron continued to deny his history of substance abuse and failed to consistently attend his visits with Austin until only months before the fact-finding hearing commenced.

While Aaron argues the trial court failed to "credit" his attendance at parenting classes, we are unpersuaded. In rendering its oral decision, the trial court found Aaron had attended parenting classes, but it relied more heavily on Dr. Wells' report and testimony finding that, even after attending classes, Aaron had a limited understanding of a child's developmental needs, possessed unrealistic expectations of a child's abilities, and had an inappropriate view of a child's role in the parent-child relationship.

The trial court accepted Dr. Wells' report and unrebutted testimony, finding further delay in permanent placement would only add to the damage since Aaron did not have an appreciation for the harm facing Austin caused by his failure to assume responsibility for his parenting. Moreover, Austin does not see Aaron as a parental figure and, as Dr. Wells testified, this is unlikely to change, even with more consistent visitation.

## B.

Aaron contends the Division failed to provide him with appropriate services in a timely manner. Aaron further contends the Division and the trial court, both failed to consider alternatives to termination because they improperly deferred to Skye's rejection of KLG in favor of adoption and, rather, should have explored KLG with Mia and Skye's sister, M.S. (Millie).

20

Prong three requires the Division to make "reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home" and also to consider "alternatives to termination of parental rights." N.J.S.A. 30:4C-15.1(a)(3). Reasonable efforts are fact specific. N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 557 (2014).

Generally, the Division must "provide services to the family according to a case plan, including enlisting the assistance of relatives, providing direct services, or providing referrals to community services providers." In re Guardianship of D.M.H., 161 N.J. 365, 387 (1999). The Division also "must monitor the services, change them as needs arise, and identify and strive to overcome barriers to service provision or service utilization." R.G., 217 N.J. at 557 (quoting D.M.H., 161 N.J. at 387). The Division should, among other things, "encourage, foster[,] and maintain" the parent-child bond, "promote and assist in visitation," and inform parents of "appropriate measures [they] should pursue . . . to . . . strengthen" the relationship with their child. Ibid. (quoting D.M.H., 161 N.J. at 390).

Here, the record is replete with evidence of the Division offering multiple services, on a litany of occasions, to facilitate Aaron's reunification with Austin. The court specifically found the Division not only offered visitation services to

Aaron but also offered transportation and bus passes for visitation and substance abuse screenings. The Division also referred Aaron to therapeutic supervised visitation through the Greater Monmouth County child visitation program, but Aaron chose not to attend visitation and the program was terminated. Although Aaron argues he should have been offered domestic violence services, we are unpersuaded since the record establishes Aaron consistently denied all domestic violence allegations.

The third prong also requires the court consider alternatives to the termination of parental rights. N.J.S.A. 30:4C-12.1. The statute "does not permit the Division to embark on a course set for termination of parental rights and adoption by a foster parent without at least first exploring available relative placements." N.J. Div. of Youth & Fam. Servs. v. K.L.W., 419 N.J. Super. 568, 580 (App. Div. 2011).

We conclude the third prong was established by clear and convincing evidence in the record. The record supports the trial court's conclusion that the Division sought to avoid taking custody of Austin by implementing an SPP where Mia and Austin moved in with Skye who provided supervision. The Division further considered another maternal aunt as relative support, but Millie withdrew as a sponsor. At no point after Millie's withdrawal, did Aaron or Mia

request the Division to explore her as an alternative placement for Austin, nor did Millie volunteer to be considered by the Division.

Even after the Division obtained custody, Austin remained with Skye and Mason, with neither Mia nor Aaron providing other relatives' information for Division assessment. Finally, the Division discussed KLG versus adoption with the resource parents, who were committed to adoption due to a breakdown in their relationship with Aaron resulting from his conduct and because they believed it was in Austin's best interests. Aaron offered no proofs to the contrary.

## C.

We are unconvinced the trial court erred in finding the Division established the fourth prong by clear and convincing evidence, based on Aaron's suggestion there was insufficient evidence Austin would suffer harm if removed from Skye and Mason.

Prong four requires the court to determine that the "[t]ermination of parental rights will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). This prong does not require a showing that no harm will come to the child "as a result of the severing of biological ties." K.H.O., 161 N.J. at 355. Instead, the

23

issue is "whether a child's interest will best be served by completely terminating the child's relationship with that parent." E.P., 196 N.J. at 108.

Here, the trial court found the termination of Aaron's parental rights would not do more harm than good. The trial court considered the problematic dynamic between Aaron and Mia, Mia's severe mental health issues, the fraught relationship between Aaron and the maternal family, and the lack of a bond between Austin and Aaron. Dr. Wells' unrebutted expert testimony that the maternal caregivers were Austin's psychological parents, and that if the relationship was severed, Austin would "be subjected [to] physical, psychological and emotional harm and distress . . . [that] would impact him negatively," was also considered by the trial court. Citing Dr. Wells' report and testimony, the trial court found Aaron could not exercise good judgment, failed to appreciate Austin's needs, had a volatile relationship with Mia, and did not have "the ability to balance all of life's situations of work, home life, taking care of the child, [and] emergencies."

There is no evidence in the record that Aaron will be able to safely parent Austin. Aaron failed to offer a concrete plan to care for Austin other than to house him in a room he is renting from his employer and leaving him with the homeowner or a babysitter, whose qualifications or background were not

articulated, while he works. Aaron further failed to acknowledge Austin's developmental needs or offer a substantive plan to address those special needs, including continuation of speech therapy.

Based on Dr. Wells' uncontroverted report and testimony, the trial court also found Austin is in a stable home with Skye and Mason, is securely bonded with them, and would suffer emotional and developmental harm if removed from their care. Conversely, Austin only had an insecure bond with Aaron and would not suffer any harm if their relationship was severed. These findings mitigate Aaron's contention that Dr. Wells concluded his relationship with Austin might have strengthened with more visitation, since he would never have become a psychological parent. Aaron failed to present any evidence to the contrary.

To the extent we have not otherwise addressed any of appellant's remaining arguments, we determine they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

A-3568-23